UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kenny Christopher, as Trustee of
Embroidery Library, Inc., Employee
Stock Ownership Plan, and Embroidery
Library, Inc.,

   Plaintiffs,

v.             Civil No. 09-3703 (JNE/JJK)
             ORDER[1]

Harlan L. Hanson, Marcia K. Hanson,
Mark B. Hanson, and Scott E. Hanson,

   Defendants.

---

Shannon M. Awsumb, Esq., Mary L. Knoblauch, Esq., and Richard T. Ostlund, Esq., Anthony Ostlund Baer & Louwagie PA, appeared for Plaintiffs Kenny Christopher and Embroidery Library, Inc.

S. Jamal Faleel, Esq., David R. Marshall, Esq., and Crystal M. Patterson, Esq., Fredrikson & Byron, PA, appeared for Defendants Harlan L. Hanson, Marcia K. Hanson, Mark B. Hanson, and Scott E. Hanson.

---

   This lawsuit revolves around two transactions between Plaintiff Embroidery Library, Inc.

(ELI), its Employee Stock Ownership Plan (ESOP), and Defendants Harlan L. Hanson, Marcia

---

[1]   At oral argument, the Court asked the parties why they filed their summary judgment briefs, affidavits, and exhibits under seal. Plaintiffs stated that they wanted the record under seal because of sensitive facts. Defendants indicated that they wanted the materials to be unsealed. The Court invited briefing on the issue, and the parties submitted lengthy briefs. This Order does not mention any of the facts that Plaintiffs argue justify sealing the record. The Court also notes that oral argument was held in open court. The Court therefore files this Order unsealed. Moreover, the Court will unseal the parties' summary judgment filings on June 28, 2011. The Court will, however, entertain the parties' suggested redactions so long as they are received by the Court on or before June 21, 2011. If a party wishes to suggest redactions, counsel for that party must submit them to the Court as complete hard-copies of the filings with the suggested redactions.

K. Hanson, Mark B. Hanson, and Scott E. Hanson.  The Hansons are former members of ELI's

board of directors, and Harlan[2] is a former ESOP trustee.  In two transactions in January 2006

and December 2006, the Hansons disposed of all of their ELI stock through a combination of

sale to the ESOP and redemption by ELI.  The Hansons financed the transactions.  The gist of

Plaintiffs' claims is that the Hansons breached various duties by inflating the price of ELI stock

and requiring ELI to enter into burdensome restrictive covenants as part of the security

agreement that financed the transactions.  Counts one through four of the Complaint are brought

under the Employee Retirement Income Security Act of 1974 (ERISA) and allege violations of

the Hansons' duties as ESOP fiduciaries.  Counts five through ten are state-law claims, arising

under the Minnesota Business Corporation Act and common law.

The Hansons now move for summary judgment on all counts.  Specifically, they argue

that: (1) the ERISA counts, insofar as they are based on the December 2006 transaction, fail

because the Hansons were no longer ESOP fiduciaries at that time; (2) the ERISA counts, insofar

as they are based on the January 2006 transaction, are time barred; (3) the ERISA counts fail

because the Hansons did not breach their fiduciary duties and, in any event, a hypothetical

prudent person would have approved the transactions and the transactions were for adequate

consideration; (4) the ERISA counts that include Marcia, Mark, and Scott (two through four) fail

as against them because there is no evidence that they knew of Harlan's alleged breaches; (5)

counts five through seven are preempted by ERISA; (6) count six, a state-law claim for breach of

fiduciary duty, fails on the breach element; (7) count eight, unjust enrichment, fails because a

valid contract governs the parties' rights; (8) count nine, aiding and abetting, fails because there

is no evidence that Marcia, Mark, or Scott knew of the alleged breaches of fiduciary duty; and

---

[2]        For brevity, the Court will refer to the individual Defendants by their given names.

(9) count ten, civil conspiracy, fails because there is no underlying tort and because civil conspiracy does not entitle a party to additional damages.  After describing the facts, the Court will address each of these arguments in turn.

As explained below, the Court grants summary judgment to the Hansons on count nine but otherwise denies the motion.

## I.  BACKGROUND[3]

ELI is a closely held corporation that creates embroidery designs and sells those designs over the Internet.  In 1998 Harlan created ELI.  Eventually, ELI merged with another embroidery company, Starbird, Inc., which was purchased by Harlan and his wife, Marcia, in 1987.  ELI's annual sales grew steadily from 1998 to 2006, reaching over $6 million as ELI acquired a customer base of over 100,000 registered users of the company's website.  The Hanson family (Harlan, Marcia, and their two sons Mark and Scott) were on ELI's board of directors through December 31, 2006.  After retirement from a retail career in 1997, Marcia served on ELI's board and occasionally assisted with ELI's customer service.  Mark graduated from high school in 1985 but has no college degree or business experience.  He worked as ELI's webmaster from the late 1990s until late 2005 and testified that he has been "retired, basically," since leaving ELI.  Scott, an electrician, has a college degree in studio arts and lived in Colorado until late 2006.  He has little business or financial experience and visited ELI's offices in Minnesota infrequently while he was on ELI's board.  Before 2000, the Hansons owned 100% of ELI's stock.

---

[3]     Unless otherwise stated, the facts described below are undisputed or are those that a reasonable fact-finder could find when viewing the record in the light most favorable to Plaintiffs.

In 2000 Harlan created the ESOP.  The ESOP is a type of ERISA plan that invests primarily in the employer's stock.  Generally speaking, participating ELI employees are allocated ELI stock, which is then held in trust by the ESOP.  When participating employees retire, they sell their stock to the ESOP.  When the ESOP was formed, the Hansons sold 30% of their ELI stock to the ESOP.  Harlan was an ESOP trustee from the ESOP's inception until he resigned in mid-December 2006.  Debra Mundinger, who began working with ELI as a copywriter in 2001, was an ESOP trustee when the challenged transactions occurred.  Kenny Christopher, who began working for ELI in 1994[4] and eventually became Vice President of Production, has been an ESOP trustee since 2005.  James Steffen became an ESOP trustee in mid-December 2006.

Because ELI sponsored the ESOP, it was required to have its stock periodically appraised so that the ESOP could allocate ELI shares according to the plan's allocation formula.  Lyndon Steele of Gerald Gray & Associates was primarily responsible for the stock appraisals beginning from the ESOP's formation to 2009.  The parties generally agree that Steele was an independent appraiser.

In early 2004 Harlan hired Prestwick Partners (Prestwick), an investment banking firm, to market ELI for sale.  Prestwick found several potential buyers interested in purchasing ELI for up to $4.4 million plus an earn out.  One valuation of ELI given during the marketing process was $5.6 million.  Although he later distanced himself from the comment, Ingo Schulz of Prestwick told Harlan that a $15.2 million appraisal of ELI done by Steele was "criminal."  As

---

[4]    The parties indicate that Christopher began working for ELI in 1994 (Defs.' Memo. 2; Pls.' Resp. 7), but they also agree that ELI was formed in 1998.  The Court surmises that Christopher began his employment with "ELI" by working for Starbird.

part of its work for ELI, Prestwick provided Harlan with market feedback on ELI's value. Harlan became frustrated with Prestwick's marketing and abandoned his idea to sell ELI when Prestwick failed to obtain any offers close to Steele's $15.2 million appraisal.

In late 2004 and 2005 Harlan began pursuing the sale of the Hansons' ELI shares to the ESOP and the redemption of the Hansons' ELI shares by ELI. During a meeting that began on December 23, 2004, and was extended to January 2, 2005, the ELI board resolved to use "all available corporate profits" to purchase the Hansons' shares until the ESOP was "the sole Shareholder." (Mundinger Dep. Ex. 48) During that same meeting, Mundinger was made a member of the board. In January 2005 the Hansons sold some of their shares at $91.77 per share to the ESOP as a first step to effecting this resolution. This transaction is not challenged in this lawsuit. In late 2005 Harlan obtained, for ELI and the ESOP, a $4 million loan commitment from a bank to finance buying out the Hansons. Ultimately, Harlan abandoned the loan and decided that the Hansons would finance the ESOP's purchase of and ELI's redemption of the Hansons' remaining ELI stock.

In September 2005 Harlan retained attorney Stephen Eide to represent ELI in connection with the transactions. Eide recommended to Harlan that ELI should appoint an independent trustee with independent legal counsel to negotiate the transactions at arm's length with the Hansons. Harlan then had Steele prepare an appraisal, but Harlan did not give Steele any information about Prestwick's failed attempts to sell ELI.

On December 26, 2005, the Hansons voted to elect Mundinger as President and Chief Operating Officer of ELI.

On January 25, 2006, the ESOP purchased stock from the Hansons at $168.25 per share for a total of $2,019,000.00, and ELI redeemed some of the Hansons' stock at the same price for

a total of $4.8 million.  The share price was based on Steele's appraisal.  There was no

independent trustee, and the ESOP was not represented by an independent attorney.  The

transaction was financed with bonds payable to the Hansons and left the ESOP holding the

majority, 50.2%, of ELI shares.

In spring 2006 Harlan told Mundinger that he intended to sell the rest of the Hansons'

ELI shares to the ESOP and ELI in December for $275 per share.  Harlan told Mundinger that

she would be fired if she did not make the transaction happen.  In June 2006 Harlan met with

Eide to prepare for the December 2006 transaction.  Harlan outlined the terms of the transaction

and had Eide prepare draft documents.  Under Harlan's terms, the ESOP would buy some 8000

shares of ELI stock from the Hansons at $275 per share and ELI would convert some 76,000

shares of the Hansons' ELI stock to seven-year bonds at the same price.  Harlan also required

several restrictive covenants from ELI as part of the security agreement that financed the

purchase and conversion.

As with the January 2006 transaction, Eide represented only ELI, and he advised Harlan

that an independent trustee should be appointed, that the ESOP should have separate legal

counsel, and that the negotiations should be arm's-length.  After receiving Eide's advice, Harlan

indicated that arm's-length negotiations would occur before the transaction closed.  The advice

to appoint an independent trustee was not communicated to Christopher, who was then an ESOP

trustee.  Eide did not consult with the independent appraiser concerning the value of the stock

while preparing the draft documents, and he states that he was "directed by [ELI] not to do so."

(Eide Aff. Ex. E ¶ 7.7, Nov. 16, 2010)

One of the terms on which Harlan insisted was a covenant by ELI's officers and board

not to sell the company for three years.  This covenant was not included in the draft documents

prepared by Eide.  Eide warned that the non-sale covenant would make it difficult to reach

Harlan's targeted $275 share price, and that the covenant would necessarily apply to the ELI

shares that the ESOP already owned.  Eide advised that the ESOP would have to receive

consideration for this effect.  Otherwise, he warned, it would be a breach of fiduciary duty.  The

Hansons point to no evidence indicating that the ESOP received consideration for the non-sale

covenant's effect on its shares.  Eide's draft documents included other restrictive covenants that

Harlan required as part of the security agreement, including restrictions on payroll increases, on

funding of the ESOP's repurchase obligations, on cash on hand, and on the purchase of major

assets.  Eide criticized some of these covenants as being overly restrictive.  Beyond the initial

drafting and advice, Eide did no other substantial work on the transaction documents.

   In August 2006, after instructing Mundinger to remove all references indicating that

Eide's documents were "drafts," Harlan had Marcia finalize the closing books for the December

2006 transaction.  This occurred well before the final appraisal of ELI stock, which was

conducted by Steele in late 2006.  The Hansons point to no evidence indicating that there were

arm's-length negotiations between the Hansons, ELI, and the ESOP regarding the December

2006 transaction.

   In late 2006 Harlan had Steele appraise the value of ELI stock for the final, December

transaction.  One of Plaintiffs' experts, Michael Doyle, testified that a different appraiser should

have been used because of the "history" and "ties" between ELI, Harlan, the ESOP, and Steele.

Harlan provided Steele with a target price of $275 per share.  Another of Plaintiffs' experts,

Mark Sheffert, testified that providing an appraiser with a target value was outside of normal

procedure.  Plaintiffs also point out that Harlan failed to give Steele several pieces of

information, which, they argue, were necessary to obtain an accurate appraisal of ELI stock.  As

7

mentioned above, Harlan did not inform Steele of the prior attempts to sell ELI and did not provide Steele with the information and analysis that Prestwick produced during its marketing of ELI.  Harlan also did not inform Steele of the non-sale covenant that would accompany the security agreement.  One of Plaintiffs' experts, Robert Gross, asserts in his expert report that the non-sale agreement should have been reflected in share price with a 25% marketability discount. Harlan also failed to inform Steele of the other restrictive covenants that were part of the security agreement for the December 2006 transaction.  Steele testified that these covenants are of a type that could potentially impact the value of a company's stock.

Plaintiffs also assert that Harlan should have ensured that Steele applied a second marketability discount because ELI is a closely held corporation.  There is evidence in the record that a 5% marketability discount is "industry practice" and should have been applied.  According to Gross, shares of closely held corporations are usually discounted 30%, but where an ESOP is involved this discount is usually reduced to 5-10% because of the ESOP's obligation to repurchase shares.  Gross asserts that a 5% discount was appropriate for ELI.  Steele testified that even though his appraisal report indicated that he spoke with legal counsel for ELI concerning the marketability discount, he did not speak with ELI's counsel, Eide, while preparing the appraisal for the December 2006 transaction.  As stated above, the record allows a fact-finder to conclude that Harlan instructed Eide not to communicate with Steele regarding the appraisal.

Sales projections were an important factor in Steele's appraisals, and the parties dispute whether Steele or Harlan was primarily responsible for generating the projections.  Plaintiffs argue that Harlan generated inflated sales projections to produce an inflated share price and maximize the Hansons' pay out.  The Hansons argue that Steele was ultimately responsible for the projections and that if the projections were wrong, they are not to blame because Steele was

8

an independent appraiser.  Steele testified that he was required to evaluate Harlan's projections and determine their validity.  He also testified that he looked at ELI's management's past projections to see how accurate they had been and that he considered the sales levels and expenses needed to reach the projections.  In sum, Steele testified that his firm had "a fair amount of discussions" as to the reasonableness of the projections and that he used those projections as the basis for his appraisal.  Based on the decreasing growth rate of ELI's registered, online users, Gross asserts that the sales projections were vastly overstated.  The projections proposed by Harlan and used by Steele were $10.5 million, $14.9 million, and $19.5 million for 2007, 2008, and 2009, respectively.  Actual sales were $7.2 million, $8 million, and $9.5 million for 2007, 2008, and 2009, respectively.

On December 31, 2006, Steele issued a fairness opinion reaffirming his appraisal for the December transaction, which valued ELI stock at $286.52 per share.  In producing the fairness opinion, as was the case for the appraisal, Steele did not review the security agreement and was not aware of the restrictive covenants that were included in the agreement, including the non-sale covenant.

The final transaction closed on December 31, 2006.  The terms were those that Harlan had communicated to Eide in June 2006: the ESOP bought some 8000 shares at $275 per share, for a total price of some $2.2 million; and ELI redeemed some 76,000 shares at that same price, for a total of some $21 million.

Plaintiffs assert that Marcia, Mark, and Scott took no actions to monitor or evaluate Harlan's performance of his duties as an ESOP trustee and that they did nothing to examine the accuracy of Steele's appraisals.  The record would allow a reasonable fact finder to draw this conclusion.  For example, in his expert report, Sheffert suggests that Marcia, Mark, and Scott

were unqualified to be on ELI's board and did little more than rubber stamp Harlan's decisions

and actions.  The record also allows a jury to conclude that both Mark and Scott saw the

December 2006 transaction documents for the first time on December 31, 2006, just before

signing them.

## II.      DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to

particular parts of materials in the record," show "that the materials cited do not establish the

absence or presence of a genuine dispute," or show "that an adverse party cannot produce

admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "The court need

consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ.

P. 56(c)(3).  In determining whether summary judgment is appropriate, a court must look at the

record and any inferences to be drawn from it in the light most favorable to the nonmovant.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## A.      Fiduciary status as of December 2006

According to the Hansons, Plaintiffs' ERISA counts based on the December 31, 2006,

transaction fail because, the Hansons argue, they were not ERISA fiduciaries when the

transaction closed.  The Hansons assert that Harlan resigned from his position as ESOP trustee

two weeks before the closing, and all of the Hansons resigned from their board positions the day

of the closing.  The Hansons' argument fails for at least two reasons.  First, in support of their

assertion that they resigned as board members before the transaction was consummated, the

Hansons cite their resignation letters, which are dated December 31, 2006.  The Hansons do not

10

cite anything in the record to suggest that their resignations were executed before the Stock

Purchase and Sale Agreement, which was executed that day.  Accordingly, drawing inferences in

Plaintiffs' favor, the Court concludes that there remains a disputed issue of fact as to whether the

Hansons were board members when the agreement was executed.  Second, Plaintiffs' theory is

that Harlan strong-armed and manipulated ELI's non-Hanson executives, ESOP trustees, and

directors into agreeing to the December transaction, and that the other Hansons, as directors,

allowed this to occur by failing to monitor Harlan, Mundinger, and Christopher.  These alleged

breaches of duty were committed before the Hansons resigned.  Therefore, the alleged breaches

did not occur "after [the Hansons] ceased to be . . . fiduciar[ies]."  *See* 29 U.S.C. § 1109(b)

(2006).

**B.      Statute of limitations**

The Hansons assert that Plaintiffs' ERISA claims based on the January 2006 transaction

are time barred.  Because Plaintiffs' ERISA claims are based on both the January and December

2006 transactions and because the Court rejects the Hansons' argument about their fiduciary

status regarding the December 2006 transaction, the Hansons' statute of limitations argument

will not dispose of the ERISA claims in their entirety.  Accordingly, the Court declines to rule on

the issue in response to a motion for summary judgment on all counts of the Complaint.

**C.      Merits of ERISA claims**

*1.      Breach of fiduciary duty*

Counts one and two allege that the Hansons breached the fiduciary duties of prudence

and loyalty imposed on them by 29 U.S.C. § 1104(a) (2006).  To meet their burden under this

provision, Plaintiffs must make a prima facie showing that the Hansons acted as fiduciaries,

breached their fiduciary duties, and thereby caused a loss to the ESOP.  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594-95 (8th Cir. 2009).

> Once the plaintiff has satisfied these burdens, "the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . . the breach of duty."  As the party moving for summary judgment, however, the trustees can prevail only by demonstrating the absence of a genuine issue of material fact either on elements of the claim for which the plaintiffs bear the burden of persuasion at trial or on elements for which the trustees themselves bear the burden of persuasion at trial.

*Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994) (alteration in original) (citations omitted) (quoting *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir. 1992)).

ERISA imposes twin duties of loyalty and prudence on fiduciaries, requiring them to discharge their duties "solely in the interest of the participants and beneficiaries" and to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  § 1104(a)(1).  The ERISA "prudent person standard is an objective standard . . . that focuses on the fiduciary's conduct preceding the challenged decision."  *Roth*, 16 F.3d at 917.  In evaluating whether a fiduciary has acted prudently, a court must focus on the process by which fiduciaries make their decisions rather than the results of those decisions.  *Id.* at 917-18.  Here, a reasonable jury could conclude that Plaintiffs have established a prima facie case that the Hansons were acting as fiduciaries, that they breached their fiduciary duties, and that the breach caused a loss to the ESOP.

The following applies to both the January and December 2006 transactions.  The Hansons had a pecuniary interest in obtaining the largest possible payment for their ELI shares.  Eide advised Harlan that the ESOP should be represented by independent counsel and that the negotiations should be arm's-length.  The record allows a conclusion that Harlan did not follow

this advice.  Harlan also did not advise Steele of the failed attempts to sell ELI through

Prestwick.  The Hansons argue that this evidence is irrelevant because Plaintiffs' expert, Gross,

testified that the Prestwick information did not, in the end, affect his valuations.  But the

evidence still bears on whether Harlan's conduct was prudent; whereas the Hansons' argument

bears on whether withholding the Prestwick information caused a loss to the plan.  It also bears

on whether Harlan was acting solely in the plan's and plan beneficiaries' interest—the fact that

he kept, from Steele, information that could have resulted in a lower appraisal suggests that he

was acting for his own benefit rather than for the benefit of those to whom he owed a fiduciary

duty.  Harlan provided Steele with profit projections, which according to Gross and, to a certain

extent, Prestwick, were dubiously high.  And while the Hansons urge the Court to conclude that

the sales projections were Steele's rather than Harlan's, such a conclusion is not appropriate at

the summary judgment stage.  Moreover, the record contains a fact dispute as to whether it was a

breach of fiduciary duty to rely on the profit projections in evaluating Steele's appraisals.  In

determining that the projections were too high, Gross examined the decreasing, and eventually

stable, rate of growth of new registered users of ELI's website.  The record contains no evidence

that Harlan conducted any similar analysis when he produced the projections he provided to

Steele, and there is no evidence that Harlan considered the decreasing growth rate of users when

evaluating the projections.  The record also contains expert evidence that an appraiser other than

Steele should have been used for the transactions because of the history and ties between Steele,

Harlan, ELI, and the ESOP.

Regarding the December 2006 transaction, the record allows the conclusion that Harlan

did not inform Steele of the non-sale covenant or the other restrictive covenants that were

included in the security agreement.  Further, the record contains evidence that Harlan instructed

Eide not to communicate with Steele concerning the appraisals and that he told Mundinger that she would be fired if Harlan's predetermined price of $275 per share was not met.  Gross's report indicates that ELI stock was worth $126.35 and $158.55 in December 2005 and November 2006, respectively.  These estimates did not correct for what Gross considered to be overly optimistic profit projections.  Gross states that if the projections were lowered to something more reasonable then the share values would be "very consistent" with $100.00 and $132.16.  Gross cites the exclusion of the non-sale covenant and other restrictive covenants as major causes for the discrepancy between his and Steele's appraisals.  The Hansons argue that the non-sale covenant does not justify a marketability discount because the ESOP is a built-in market for ELI shares.  This idea, however, is challenged in Gross's expert report.  Although the Hansons' argument on this point is appropriate for consideration at trial, it is not appropriately resolved by the Court on a motion for summary judgment.  Eide advised Harlan that the ESOP should have received consideration for the effect of the non-sale covenant on the shares that it held before the December 2006 transaction—the Hansons point to no evidence suggesting the ESOP received such consideration.  Based on this record, a reasonable fact finder could conclude that the Hansons breached their fiduciary duties and that the breaches resulted in a loss to the ESOP.

The Hansons argue that summary judgment should be granted in their favor because, regardless of whether they breached their fiduciary duty, a hypothetical fiduciary would have approved the transactions.  Because the record allows a reasonable jury to find that Plaintiffs have established their prima facie case, the Hansons have the burden of demonstrating that a prudent fiduciary would have approved the transactions.  The gist of the Hansons' argument is that a hypothetical fiduciary would have accepted Steele's appraisals.  But the record contains evidence suggesting that the appraisals obtained from Steele and the negotiations between the

14

Hansons and Plaintiffs were flawed because of manipulation by Harlan.  Accordingly, the Court

cannot conclude that the Hansons have demonstrated that there is no disputed issue of material

fact as to whether a hypothetical prudent fiduciary would have approved the transactions.

2.      *Prohibited transaction*

Count three alleges that the Hansons violated 29 U.S.C. § 1106(a) (2006), which

prohibits certain transactions between ERISA plans and interested parties.  Specifically,

Plaintiffs allege that the transactions were prohibited under § 1106(a)(1)(A) and (D):

> Except as provided in section 1108 of this title:
>
>> (1) A fiduciary with respect to a plan shall not cause the plan to engage in
>> a transaction, if he knows or should know that such transaction constitutes
>> a direct or indirect—
>>
>>> (A) sale or exchange, or leasing, of any property between the plan
>>> and a party in interest; [or]
>>>
>>> . . .
>>>
>>> (D) transfer to, or use by or for the benefit of a party in interest, of
>>> any assets of the plan . . . .

§ 1106(a).  The Hansons do not dispute that the transactions were prohibited in ERISA terms—

that assumption is, in fact, the basis for their statute of limitations argument.  Instead, they argue

that the transactions are exempted from § 1106(a) because the plan received adequate

consideration for the transferred property.  *See* 29 U.S.C. § 1108(e) (2006).  Given the record

described above, including expert evidence that the share price for both transactions was much

too high and allegations that Harlan withheld information from the appraiser that would have

resulted in a lower share price, the Court cannot conclude that there is no fact dispute as to

whether the transactions were for adequate consideration.

**D.     ERISA claims against Marcia, Mark, and Scott**

Counts two and three are direct fiduciary liability claims.  The Hansons do not appear to dispute that Marcia, Mark, and Scott were ERISA fiduciaries under 29 U.S.C. § 1002(21)(A) (2006), courtesy of their positions on ELI's board and the concomitant power to appoint ESOP trustees.  The parties agree that, as fiduciaries, Marcia, Mark, and Scott had a duty to monitor and evaluate Harlan's performance as an ESOP trustee.  The Hansons argue, however, that Marcia, Mark, and Scott did not breach this duty because they did not know or have reason to know of Harlan's alleged misdeeds.  It is undisputed that Marcia, Mark, and Scott knew that Harlan was a selling shareholder and that he therefore had an interest in obtaining the highest price possible for his ELI shares.  The record would also allow a reasonable jury to conclude that, as ELI directors and selling shareholders in both transactions, Marcia, Mark, and Scott had reason to know (1) about the restrictive covenants in the security agreement, including the non-sale covenant; (2) that Steele's appraisal did not take these covenants into account; (3) that there were no arm's-length negotiations between them and the ESOP; and (4) that the ESOP was not represented by an independent attorney.  Thus, a reasonable jury could conclude that Marcia, Mark, and Scott had reason to know of Harlan's alleged breaches.  Summary judgment on their direct fiduciary liability is inappropriate.

Count four alleges co-fiduciary liability under 29 U.S.C. § 1105(a) (2006), which states:

[A] fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

16

> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

§ 1105(a).  The Hansons argue that subsection (a)(2) does not apply here because the direct fiduciary liability claim against Marcia, Mark, and Scott fails.  Having concluded that the failure-to-monitor direct fiduciary liability claims against Marcia, Mark, and Scott survive summary judgment, the Court rejects the Hansons' argument regarding co-fiduciary liability.  A reasonable fact finder could conclude based on this record that Marcia, Mark, and Scott are liable as co-fiduciaries because their failure to monitor Harlan enabled his alleged breach of fiduciary duty.

## E.    Preemption

The Hansons argue that Plaintiffs' claims for violations of the Minnesota Business Corporation Act (Count 5), for breach of fiduciary duty (Count 6), and for breach of the duty of loyalty (Count 7) are preempted by ERISA.  Plaintiffs respond that the claims are not preempted because they are based on the state-law obligations owed by the Hansons to ELI rather than ERISA-based obligations owed to the ESOP.  Plaintiffs assert that the duties owed to ELI are implicated by the redemption of the Hansons' shares by ELI rather than the purchase of shares by the ESOP.  The Court concludes that Plaintiffs' state-law claims are not preempted insofar as they are claims by ELI against the Hansons.

"Except as provided in subsection (b) . . . , the provisions of [ERISA] . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ."  29 U.S.C. § 1144(a) (2006).  In *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983), the Supreme Court stated that a law *relates to* an employee benefit plan under § 1144(a)

17

if it (1) expressly refers to, or (2) has a connection to such a plan.  The Eighth Circuit Court of

Appeals has elaborated on the Court's rule:

> Our court has identified seven factors to consider in determining whether a state
> law claim has a connection to an employee benefit plan: whether the state law (1)
> negates an ERISA plan provision; (2) affects relations between primary ERISA
> entities; (3) impacts the structure of ERISA plans; (4) impacts the administration
> of ERISA plans; (5) has economic impact on ERISA plans; (6) whether
> preemption of the state law is consistent with other ERISA provisions; and (7)
> whether the state law is an exercise of traditional state power.

*Eckelkamp v. Beste*, 315 F.3d 863, 870 (8th Cir. 2002).

The Hansons primarily rely on two cases to support their preemption argument:

*Eckelkamp* and *MacDonald v. Summit Orthopedics, Ltd.*, 681 F. Supp. 2d 1019 (D. Minn. 2010).

Both are distinguishable from this case because they involved suits by ERISA plan beneficiaries

against an ERISA plan fiduciary.  Without the ERISA plan there would have been no cause of

action in either case.  Here, the claim is by a corporation against its former directors relating to

the redemption of stock.  These claims exist with or without an ERISA plan and assert

independent state-law causes of action.  Further, the *Eckelkamp* court, in deciding that the

particular state law at issue was preempted, distinguished a case similar to this one:

> Plaintiffs' reliance on *Delta Star, Inc. v. Patton*, 76 F. Supp. 2d 617 (W.D.
> Pa. 1999), is misplaced.  Preemption was not an issue in *Delta Star*.  In that case a
> former company president, director, and ESOP fiduciary was found to have
> breached fiduciary duties under both ERISA and state law, but the state claims in
> *Delta Star* had been brought under state law by the corporation and the ERISA
> claims under federal law by the ESOP.  *Id.* at 632-40.  Here the ESOP owned
> company is not seeking to bring a claim for breach of fiduciary duty, but the
> ESOP beneficiaries are seeking to assert such a claim on behalf of the ESOP.
> Such claims are appropriately brought under ERISA.

*Eckelkamp*, 315 F.3d at 870-71.  This case is similar to *Delta Star*.  The Hansons were directors

of the corporation and fiduciaries of the ESOP.  ELI asserts claims against the Hansons for

breaches under state law related to the redemption of the Hansons' shares, and the ESOP (or

more accurately, an ESOP trustee) asserts claims against the Hansons based on the sale of their stock to the ESOP.

*McCallum v. Rosen's Diversified, Inc.*, 41 F.3d 1239 (8th Cir. 1994), further supports Plaintiffs' position.  In *McCallum*, the plaintiff owned 12,000 shares of a corporation that he received as compensation for his employment.  He also owned 3300 shares through an ESOP. He asserted a state-law appraisal and buyout claim concerning the 12,000 non-ESOP shares.  The defendants asserted that the plaintiff's appraisal and buyout claim was preempted by ERISA. The claim, the defendants argued, was "related to" the ESOP because a court appraisal would affect the value of the ESOP's shares.  The Eighth Circuit rejected the defendants' argument because, in part, "[p]reempting a statute which is intended to apply only to stock outside of an ERISA plan would have a far-reaching and unintended impact beyond the scope of ERISA."  *Id.* at 1241-42.  The situation here is similar.  The state-law claims here will economically impact the ESOP because the judgment of whether the redemption complies with state law entails an evaluation of whether the redemption price was fair.  This is not enough to preempt the state-law claims.  To hold otherwise would imply the preemption of state-law claims concerning share transactions simply because the corporation has an ESOP whose holding might be affected by the state-law claims.  The Court rejects the Hansons' preemption argument insofar as it relates to claims asserted by ELI.

**F.      State-law breach of fiduciary duty**

The Hansons also move for summary judgment on count six of the Complaint, which alleges a state-law claim of breach of fiduciary duty.  The same facts that support Plaintiffs' ERISA fiduciary-duty claims support ELI's state-law fiduciary-duty claim; thus, the state-law claim survives summary judgment.

19

G.      **Unjust enrichment**

The Hansons argue that Plaintiffs' unjust enrichment claim fails because there are contracts covering the transactions at issue.  A claim for unjust enrichment may arise when a party gains a benefit illegally or unlawfully.  *Holman v. CPT Corp.*, 457 N.W.2d 740, 745 (Minn. Ct. App. 1990).  An unjust enrichment claim "may be founded upon failure of consideration, fraud, or mistake, or 'situations where it would be morally wrong for one party to enrich himself at the expense of another.'"  *Id.* (citations omitted).  However, "equitable relief cannot be granted where the rights of the parties are governed by a valid contract."  *U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981).  The Hansons' argument fails because the gravamen of Plaintiffs' case is that the contracts were obtained in violation of the Hansons' fiduciary duties under state and federal law.  Plaintiffs are not seeking recovery on the contracts—and there is, in fact, no allegation of which the Court is aware that the Hansons breached their obligations under the governing contracts.  Instead, Plaintiffs ask for relief based on rights *not governed* by the contracts.  Accordingly, the Court cannot conclude, at the summary judgment stage, that there are valid contracts governing the rights of the parties.[5]

H.      **Aiding and abetting**

The Hansons argue that Plaintiffs' aiding and abetting claim against Marcia, Mark, and Scott fails because there is no evidence that they had actual knowledge of Harlan's tortious conduct.  Aiding and abetting tortious conduct has three elements: "(1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the

---

[5]      It appears as though Plaintiffs' unjust enrichment claim depends on their fiduciary-duty claims.  If Plaintiffs succeed on their unjust enrichment claim, they will have almost certainly succeeded on their fiduciary-duty claims.  So, the relief for the two types of claims might well be duplicative.  The Court notes that equity would not allow a double recovery.

primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must

substantially assist or encourage the primary tort-feasor in the achievement of the breach."

*Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999).  Plaintiffs do not

point to any evidence of actual knowledge in their response to the Hansons' argument; instead,

they argue that constructive knowledge of Harlan's tortious conduct should be imputed to

Marcia, Mark, and Scott because of their long-term, close, and in-depth familial relationship with

Harlan.  "In cases where the primary tortfeasor's conduct is clearly tortious or illegal, some

courts have held that a defendant with a long-term or in-depth relationship with that tortfeasor

may be deemed to have constructive knowledge that the conduct was indeed tortious."  *Id.* at

188.  But here, as in *Witzman*, the tortious conduct was not so clearly illegal or unlawful so as to

justify imputing constructive knowledge—whether Harlan's actions constituted a breach of his

fiduciary duties requires a fact-intensive look at his conduct in comparison with that of a prudent

person.  Accordingly, imputing constructive knowledge to Marcia, Mark, and Scott is not

appropriate.  Further, the elements of knowledge and assistance are viewed in tandem: "where

there is a minimal showing of substantial assistance, a greater showing of scienter is required."

*Id.* (internal quotation marks omitted).  Here, the showing of substantial assistance, aside from

Marcia's preparation of the closing books, amounts to a failure to monitor.  Given the lack of

affirmative assistance in tandem with the lack of evidence of actual knowledge, the Court cannot

conclude that a reasonable jury could find for Plaintiffs on their aiding and abetting claim.

Summary judgment on count nine is appropriate.

## I.      Conspiracy

Count ten alleges civil conspiracy to breach fiduciary duty.  The Hansons argue that summary judgment on this count is appropriate because the underlying tort, breach of fiduciary duty, fails.  As discussed above, the Court rejects the Hansons' arguments regarding the underlying breach of fiduciary claims, so summary judgment on the conspiracy claim based on those arguments is inappropriate.  The Hansons also argue that civil conspiracy does not allow for additional recovery beyond that for the underlying tort.  Like the Hansons' statute of limitations argument, this argument will not dispose of the entire claim—instead, the Hansons ask the Court to award partial summary judgment on the extent to which damages are available under the conspiracy count.  The Court declines to entertain such a ruling in response to a motion for summary judgment on all counts of the Complaint.

## III.      CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.      The Hansons' Motion for Summary Judgment [Docket No. 86] is GRANTED IN PART and DENIED IN PART.

2.      Summary judgment in favor of the Hansons is GRANTED as to count nine, the aiding and abetting claim, but it is DENIED as to all other counts.

Dated:  June 6, 2011

                                          s/  Joan N. Ericksen
                                          JOAN N. ERICKSEN
                                          United States District Judge